462 F.Supp. 123 (1978)
CONTINENTAL BANK & TRUST CO., as Trustee for the Lot Purchasers, and Calwood Leisure Assn., Inc., Donald L. Ewens, Harold D. Barnhard, Maurice Stack, Intervening Plaintiffs,
v.
AMERICAN BONDING CO., Defendant and Third Party Plaintiff,
v.
CALWOOD LEISURE ASSN., INC., Defendant,
v.
Richard D. WALKER, John W. Markham, Systems Leisure Properties, Inc., and Camp Leisure Lake, Inc.
No. 75-1095C(1).
United States District Court, E. D. Missouri, E. D.
November 15, 1978.
*124 Kenneth R. Heineman, Coburn, Croft, Shepherd & Herzog, St. Louis, Mo., Robert C. Smith, Jr., Smith, Lewis & Rogers, Columbia, Mo., D. Jeff Lance, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for plaintiffs.
F. L. Kenney, Jr., Kenney, Leritz & Reinert, St. Louis, Mo., for defendant.

*125 MEMORANDUM
MEREDITH, Chief Judge.
This matter is before the Court on final submission of various claims for relief arising from the financial failure of a subdivision development in Callaway County Missouri called "Leisure Lake Subdivision." Pursuant to Rule 52(a), Fed.R.Civ.P., the Court makes the following findings of fact and conclusions of law.
Continental Bank & Trust Company, a Missouri corporation, (Continental) originally filed this diversity action on November 28, 1975, as a suit on five performance bonds issued by the American Bonding Company, a Nebraska corporation, (American). 28 U.S.C. § 1332.
At some point in 1972 Richard D. Walker (Walker) and John W. Markham (Markham), both California residents, entered into discussions about developing tracts of land located in Callaway County Missouri. To develop the proposed project, known as "Leisure Lake Subdivision," Walker, Markham (now deceased), and Gary Goldman, also a California resident, formed several legal entities.
"Camp Leisure Lake, Inc." (Camp Lake Inc.), a Missouri corporation, was incorporated with 80% of the ownership in Walker and 20% in Markham. Walker and Markham then joined with Goldman to form "Camp Leisure Lake, Ltd." (Camp Lake Ltd.), a California limited partnership, with Walker, Markham, and Camp Lake Inc. as general partners and Goldman as the limited partner. Another corporation involved in the development was "Systems Leisure Properties, Inc." (Systems), an existing California corporation owned by Walker (80%) and Markham (20%) (Developers).
Apparently the limited partnership became the developer of Leisure Lake, a proposed recreational vehicle area and campsite.
To aid in the improvement and commercial attractiveness of the subdivision, two trust agreements were entered on August 3rd and August 15th of 1972. (Continental's EXH # 49 and # 50.) Under these two agreements the developers conveyed the fee title to Continental as trustee. The original owners of the land had earlier received promissory notes and deeds of trust. They in turn released both in consideration for an interest under the trust agreement labeled "First Beneficial Interest." The "Final Beneficial Interest" under the agreement belonged to one of the developers or their entities. In the August 3rd agreement the final beneficiary was "Leisure Property Systems, Inc.," the same corporation referred to as Systems above. Under the August 15th agreement Richard Walker was designated as final beneficiary.
The terms of the two agreements were basically identical. The first beneficiary accepted "the interest provided for First Beneficiary under this agreement in lieu of a certain promissory note secured by a deed of trust encumbering the Property ..." The final beneficiaries conveyed bare legal title to Continental as trustee. The trustee had no right or interest except as holder of legal title. The trust estate consisted of all money, promissory notes, and contracts received from purchasers of lots created by the subdivision of the property.
A third trust agreement was entered May 4th, 1973. It, too, contained similar provisions set out in the two documents dated August 4th and August 15th. Final beneficiary under the 1973 agreement was Camp Lake Ltd. See Continental's EXH # 48.
In April of 1973, Continental agreed in writing to lend the project up to $1,200,000.00 for construction. The "Bank of California" was a participant in the loan because of Continental's lending limit. Repayment of the loan was to come from the net cash flow of the project under the three aforementioned trust agreements. The loan agreement was entered formally on May 18, 1973. The named borrower was Camp Lake Inc. The loan was secured by executed sales contracts in Leisure Lake and in an unrelated project near St. Louis. American EXH # 23, 24; Continental EXH # 54. Continental further appears to have received an assignment of the interest of the final beneficiaries under the three *126 trust agreements. Camp Lake Ltd., Systems, Walker and his wife, Markham and his wife, and another California partnership were all guarantors on the loan.
In order to facilitate sales of lots at Leisure Lake, to secure the loan, and to otherwise move the project along, the promoters arranged with defendant American to bond certain improvements on the property. It is evident that Continental required performance bonds before it would disburse any funds under the loan agreement. See American EXH # 2. American and the promoters contemplated that funds from the May 18 loan would be used to complete the improvements. American did not, however, require Continental to issue a "setaside letter" obligating the bank to utilize certain funds for construction. See pages 35-36 of the deposition of American's vice-president, Gillingham.
On May 11, 1973, five bonding agreements were entered. American was denominated surety; Systems was the principal; Continental and Camp Lake Ltd. were the co-obligees. Under those bonds, American acknowledged that the principal Systems had agreed with Camp Lake Ltd. and Continental for the construction of: (1) "the necessary water system for the property," (2) "the necessary sewer system and four comfort stations for the property," (3) "the necessary road system for the property," (4) "the necessary swimming pool complex and main pavilion for the property," and (5) "the necessary lake construction for the property." Each construction contract acknowledged the terms of the subdivision trust agreements and incorporated by attachment the specific tracts to which the construction applied. There were no provisions providing for the actual specifications and costs, but it is clear what was intended. Each party was aware of the interrelation between the various corporations and their owners. Each knew the money was to come from the loan from Continental. Each knew that Systems had estimated the costs to be $661,000.00.
Therefore, on May 11, 1973, American formally bonded the five improvements for a total of $661,000.00. See Continental EXH # 1-5. American also received an agreement of indemnity from Walker, Markham, Camp Lake Inc., and Systems. Continental EXH # 17.
After the bonds were issued, Camp Lake Ltd. represented to the Department of Housing and Urban Development and to prospective purchasers that the proposed improvements were guaranteed by American by the five bonds. Subsequent to July 1, 1973, 219 persons purchased lots from Continental, partially in reliance on the representation that improvements were bonded and guaranteed.
The record indicates that most, if not all, potential buyers were given a "Fact Sheet" on Leisure Lake. Calwood's EXH # 268. That document stated that "ALL MAJOR IMPROVEMENTS BONDED FOR COMPLETION ...." It further contained language that the developer (Camp Lake Ltd.) had "posted bond with the Continental Bank and Trust Company of St. Louis, as Trustee, guaranteeing you that when the master plan is completed, all promised off-site improvements in the master plan will be available to you." Id.
The method of sale used by Continental was a long term land contract. Under this form of sale, title remained with the vendor-trustee, Continental, until all installment payments had been made. At that point, title would be conveyed to the buyer. See Calwood's EXH # 279. Using such an arrangement, Continental executed all contracts presented to it by the promoters under the three trust agreements.
After the commencement of lot sales, proceeds were paid over into the appropriate trust funds under the trust agreements. However, in the fall of 1973 the project began to run into financial problems.
Systems ceased work on the bonded improvements because Camp Lake Inc. had stopped making payments to it under the construction contracts. See pages 30-31 of the deposition of Walker. Various subcontractors with whom Systems had subcontracted portions of the improvements also stopped work and later filed mechanic's *127 liens. Apparently Camp Lake Inc. had reached its borrowing limit under the loan agreement with Continental of May 18, 1973.
At this point the various parties to the aforementioned loan agreement attempted to secure refinancing of the project. This effort was unsuccessful. On February 5, 1975, Continental gave American formal notice that Systems was in default and had not completed the bonded improvements. Continental EXH # 26. This lawsuit was then filed by Continental to recover the amount of the bonds.
Judgment will be entered for Continental and against American on the five bonding agreements. American has raised several affirmative defenses which are technical and which further do not affect the finding of liability.
It is clear that American was fully aware of the details of the Leisure Lake project and, more importantly, of the nexus between Camp Lake Ltd., Camp Lake Inc., Systems, Walker, Markham, Goldman, and Duman.
Continental's EXH # 6 is a data sheet apparently prepared by American's underwriter, Neal Witt. This document reveals that American was fully apprised of the plans for development. It lists Continental Bank as the sole obligee and "as Trustee." The document refers six different times to "our principals" and states that the main parties of interest are Walker and Markham "experienced subdividers of substantial worth and of excellent repute."
Although the bonds themselves include Camp Lake Ltd. as a co-obligee with Continental, this provision is without substance because American had contemporaneously secured an agreement of indemnification from Walker, Markham, and Camp Lake Inc., the general partners of Camp Lake Ltd., for any losses that may have been incurred under the bonds.
These bonds were completion bonds and not contract bonds. On a completion bond, the principal (Systems) is not only to provide the work, but also to secure the financing. See page 54 of the Clarence Telander deposition, agent of American.
The facts and circumstances surrounding the execution of an ambiguous surety bond should be considered to determine the intent of the parties and the true meaning of the bond. Feutz v. Massachusetts Bonding & Ins. Co., 85 F.Supp. 418, 427 (E.D.Mo.1949), aff'd., 182 F.2d 752 (8th Cir. 1950). It is the Court's opinion that American was knowingly promising to Continental, as trustee under the trust agreements for potential bona fide lot purchasers, that Systems and the other related entities and owners would complete the scheduled improvements. See page 55 of the Telander deposition. In consideration thereof, American received premiums. It further had the security of the blanket indemnity agreement from Walker, Markham, and Camp Lake Inc. It is evident from American's data sheet (Continental's EXH # 6) that American relied on the reputation and financial strength of Walker, Markham, and Systems, "our principals." In addition, it is most important to observe that American knew before it bonded the improvements that the money to pay for the improvements was to come from proceeds of the loan commitment of Continental and the Bank of California.
Continental was a procedural party to the bonding agreements in the sense that the bonds were entered into in conjunction with the trust agreements. Under those agreements Continental was impliedly to act as trustee for all future purchasers. As stated above, those trust agreements should be construed in conjunction with the bonding agreements. Fuetz v. Massachusetts Bonding and Ins. Co., supra.
Finally, Continental has performed its obligations, both express and implied. It loaned Camp Lake Inc. the maximum amount under the May 18, 1973 loan agreement and it performed its duties under the trust agreements by making every sale referred to it by Camp Lake Ltd. The fact that the co-obligee, Camp Lake Ltd., may have been in default will not defeat Continental's *128 rights. As mentioned above, American's indemnity agreement with the general partners of the co-obligee renders this potential obligation to Camp Lake Ltd. a fiction.
American has raised nine affirmative defenses to Continental's claim. First, it contends Continental's claim fails to state a claim upon which relief can be granted. Clearly the amended complaint sets out a cause of action which meets the test of Rule 12(b)(6). Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).
American next alleges that the release which Continental executed on June 20, 1975 (American's EXH # 15), releases American. The record reflects that the release pertained only to a release of the obligations under the May 18, 1973 loan agreement by providing additional collateral. The fact that the bank released Systems from all liability, damages, and expenses incurred as a result of Systems "entering into and executing the Leisure Lake Loan Agreement and related documents ..." is irrelevant to the bonding agreement. The "related documents" obviously include the security agreements given at the time of the loan and not the bonding agreement. Continental did not release Systems as a principal on the bonds. Drake & Beemont Mut. Aid. Soc. Against Fire & Lightning v. United States, 330 F.2d 548, 553 (8th Cir. 1964).
Third, American contends that Continental defrauded American by representing to Systems that the release released all of each party's claims against the other. There is no evidence of this contention in the record.
Fourth, American maintains that Continental "released job funds which had been set aside to pay for the construction of the projects." However, American's agent Gillingham stated at trial that American did not require a "set-aside" commitment. Moreover, this was not a provision in the bonding agreement, construction agreement, or any of the trust agreements.
Fifth, American contends that Continental, Camp Lake Inc., and Camp Lake Ltd. were obligated to pay Systems. This issue has been dealt with above and will not be discussed at this point other than to say it is clear from Continental's EXH # 6 that American knew funds to pay for the improvements were to come from the loan and that basic management of the money was in the hands of the various promoters and their entities. Continental was not a contractor nor an owner, but a lender-trustee.
Sixth, American asserts that Continental's role as trustee, lender, and obligee creates a conflict of interest barring recovery. Although Continental used exceedingly poor judgment, there is absolutely no authority for this position, and more importantly, no relevance to the bonding agreement. Continental clearly performed its obligations under the five bonding agreements and the May 18, 1973 loan agreement.
Seventh, American claims Continental failed to notify it within a reasonable period of time. Page 7 of the bonding agreement reflects that most improvements were not scheduled for completion until December 31, 1975. Therefore, the Court finds that American was not prejudiced by any supposed delay in notice. Gimbel Bros. v. Mitchell, 203 Mo.App. 610, 219 S.W. 676, 678, (1920).
Eighth, American maintains that the scope of the bonds was increased and that its obligations were therefore enlarged. Again, this argument is without substance. Continental's EXH # 6 reflects that American knew "[t]he anticipated cost of the improvements is $661,000.00, however, additional funds may be applied to cover any overrun of costs, should this occur." Its ceiling liability was fixed at the figure and the basic improvements were not materially altered.
Ninth, American alleges a failure of consideration. This argument is totally without merit. Continental's EXH # 38 clearly reveals that American was paid reasonable premiums.
Having reached a decision that American is liable on the bonds, the next determination *129 to be made is on the damages issue. Evidence at the trial illustrated that liens existed totalling $63,672.83. It was further agreed that the 1977 cost of completion of the contemplated improvements was $240,000 for the water system, $88,625 for the sewer system and four comfort systems, $200,000 for the road system, and $108,581 for the swimming pool complex. This more than exceeds the total of the bonds. Therefore, American will be ordered to pay over the entire amount of the bonds to Continental.
The next question is how to deal with the money. The bonds name Continental as "trustee" and as "obligee." There is no doubt that the bonds were issued to protect those people who ultimately became purchasers. Continental's EXH # 6 states that the obligee is "Continental Bank & Trust Company as Trustee." American's agent Telander testified at pages 54-56 of his deposition that "[t]he bonds were to guarantee the completion of the improvements for the benefit of anyone who bought lots out there, the bank being trustee." Therefore, an implied trust was created.
One of the purposes of the subdivision trusts was spelled out in Section 3.1.4: "With respect to all Installment Sales and all Trustee Sales, to secure to the buyers thereunder such rights, titles, and interests as may be provided in the Installment Sales Contract or the Trustee Sales Contract. . . ." Furthermore, Section 4.4 gives the trustee the authorization and power to "perform any act that the Final Beneficiary is required to perform under the terms and provisions of this agreement." It can therefore be implied from all three trust agreements that Continental, as trustee, had the duty and power to collect on the bonds and utilize this money for the benefit of the lot purchasers. In this case there is a hybrid resulting trust, one which the law implies from the facts of the case and by operation of law.
It is clear, although not formally expressed, that the parties to the bonding agreements intended that any potential funds obtained from the bonds be applied to complete the improvements, and thereby inure to the benefit of those who later purchased the lots. Accordingly, Continental will be ordered to use the money from the bonds to first, pay off existing liens, and secondly, to refund purchase prices with interest. The particulars of the method of refunding will be set out hereinafter.
The Court will next address the third party complaint of American against Walker, Systems, Markham, and Camp Lake Inc. Each of these third party defendants executed a blanket indemnity agreement which provided in paragraph two that the indemnitors would indemnify the surety for all losses due to failure of the principal or indemnitors to comply with the conditions of the bonds. This agreement was admitted into evidence as Continental EXH # 17 and clearly establishes contractual liability on the part of the third party defendants. Jennings v. United States, 374 F.2d 983, 986 (4th Cir. 1967); United States v. Farr & Company, 342 F.2d 383 (2d Cir. 1965). Accordingly, the Court will enter judgment on behalf of American for $661,000.00 jointly against each of the third party defendants.
The Court will finally address the claims of Calwood Leisure Association, Inc., Barnhard, Ewers, and the class of purchasers the intervening plaintiffs.
Calwood Leisure Association, Inc., is a Missouri non-profit corporation which was formed by people who have purchased lots in the Leisure Lake Subdivision. Harold Barnhard is vice-president of Calwood and Donald Ewers is the president.
This Court, pursuant to Rule 23, Fed.R. Civ.P., certified Barnhard, Ewers and Calwood as representatives of "all persons purchasing lots in the Leisure Lake Subdivision from Continental Bank & Trust Company." These parties were allowed to intervene as plaintiffs and to assert cross claims against Continental.
The lot purchasers seek damages for breach of continental's alleged fiduciary duty to oversee the improvements and for an order requiring Continental to construct the improvements. The lot purchasers cannot *130 recover on Count I for breach of an alleged fiduciary duty arising under the bonding agreements. Since the Court found for Continental on Count I of its complaint against American on the bonds, the intervenor's contention is mooted.
In Count II of their cross claim, the intervenors assert that Continental breached an alleged implied contract to construct the improvements. In order to recover there must first be an express or implied promise to build the improvements. Poole v. Campbell, 289 S.W.2d 25, 32 (Mo. 1956).
Viewing the land contract entered by and between Continental and the lot purchaser, it is clear that Continental did not promise to construct nor to guarantee the construction of the improvements. The language is not ambiguous and the unequivocal provisions prevail. Standard Title Ins. Co. v. United Pac. Ins. Co., 364 F.2d 287 (8th Cir. 1966); Wilshire Const. Co. v. Union Elec. Co., 463 S.W.2d 903 (Mo.1971). In paragraph 3 of the contract it reads: "[Continental] shall have no responsibility or liability for any representation, agreements, conditions, or stipulations not specifically set forth in writing in this Agreement." There is no language, express or implied, that represents that Continental would construct or guarantee the construction of any improvements. The Court cannot, therefore, under the guise of interpreting a contract, shape a new contract for the benefit of one of the parties. Slotkin v. Willmering, 464 F.2d 418 (8th Cir. 1972).
It is equally certain that no such agreement should be implied from the various literature and purported oral representations given to prospective purchasers. The advertising brochures say no more than "the developers of Leisure Lake have posted bond with the Continental Bank as Trustee." (Emphasis added.) See, e. g., Calwood's EXH # 268, 277, and 300. This language does not give rise to the inference that Continental was anything more than a trustee for potential proceeds from a bond.
Even if the Court could find an obligation by Continental to construct the improvements, arguendo, specific performance would not be appropriate since an adequate remedy at law exists. Jamison Coal & Coke Co. v. Goltra, 143 F.2d 889, 894 (8th Cir. 1944). Moreover, since a grant of specific performance is discretionary, Walker Transportation Co. v. Neylon, 396 F.2d 558 (8th Cir. 1968), the Court would decline to order specific performance because it would be an exercise in futility. Mueninghaus v. James, 324 Mo. 767, 24 S.W.2d 1017 (1930). After the improvements were made, there would be no viable entity to run the subdivision and supervise the planned development. Accordingly, the Court will enter judgment in favor of Continental, and against Calwood, Barnhard, Ewers, and the class of lot purchasers on the latter's entire cross claim.
Under the general equitable power of this Court, Continental will be ordered to hold the funds from the bonds as trustee for the following purposes. It shall first pay off existing mechanic's liens properly filed by builders and materials men on the unfinished improvements. Second, the lot owners shall have the option of recission to be exercised in the following manner: Those people who own the lot in fee simple will, by assigning their legal title to Continental as trustee, receive the purchase price with interest at 6% from the date of each payment; those people who own an interest under the long term installment contract shall receive the amount of their payments with interest at 6% from the date of each payment, upon an assignment of their interest under the contract to Continental as trustee. All purchasers shall have the option of keeping their property, as is, upon satisfaction of their respective sales contracts. Each purchaser who has remaining payments due under the contract with Continental will be required to make all payments and otherwise comply with the contract if they desire to keep the property by not exercising the Court-ordered option of recission. Those purchasers who have outstanding installments past due shall be allowed to become current without any penalty to them whatsoever. All lot purchasers shall be notified by Continental within 90 *131 days of the decision by this Court. Lot purchasers shall have 180 days from date to make their decision either to keep the lots or rescind their contracts.