605 F.2d 1049
 CA 79-3241 CONTINENTAL BANK & TRUST COMPANY, as Trustee for
the Lot Purchasers, Appellee,
and
Calwood Leisure Association, Inc., Donald L. Ewens, Harold
D. Barnhard, Appellees,
v.
AMERICAN BONDING COMPANY, Appellant,
v.
CALWOOD LEISURE ASSOCIATION, INC., Appellee,
v.
Richard D. WALKER, John W. Markham, Systems Leisure
Properties, Inc., and Camp Leisure Lake, Inc., Appellees.
 No. 78-1894.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 17, 1979.
Decided Aug. 29, 1979.
Rehearing and Rehearing En Banc Denied Oct. 3, 1979.
 
 David M. Duree, Leritz & Reinert, Francis L. Kenney, Jr., St. Louis, Mo., for appellant.
 John R. McFarland, Joseph A. Kral (argued), and Kenneth W. Bean of Coburn, Croft, Shepherd, Herzog & Putzell, St. Louis, Mo., and Robert C. Smith, Jr. (argued), and Bruce H. Beckett of Smith, Lewis & Rogers, Columbia, Mo., on brief for appellees.
 Before ROSS, STEPHENSON and HENLEY, Circuit Judges.
 ROSS, Circuit Judge.
 
 
 1
 Defendant American Bonding Company (American, the surety) denies liability on five performance bonds which it executed in May 1973 in connection with a land development project, Leisure Lake Subdivision, in Callaway County, Missouri. The bonds guaranteed the performance by Systems Leisure Properties, Inc. (Systems, the principal) of obligations Systems had undertaken in five construction contracts to complete specified improvements on the project. The improvements were not completed, and plaintiff, Continental Bank & Trust Company (Continental, the bank), one of the named obligees on the bonds, sought recovery from the surety. The district court[1] awarded plaintiff the full face amount on each of the bonds, and the surety has appealed. We affirm in part, reverse in part, and remand for additional proceedings.
 
 I.
 
 2
 The promoters of the project were Richard D. Walker and John W. Markham. They were assisted by Walker's attorney, Gary Goldman. The promoters and Goldman formed the following organizations: Camp Leisure Lake, Inc. (Camp Lake Inc., the corporate developer), Camp Leisure Lake, Ltd. (Camp Ltd., the partnership developer) and Systems.[2]
 
 
 3
 Camp Lake Inc. and Systems were each owned by Walker (80%) and Markham (20%). Camp Ltd. was owned by Walker (64%), Markham (16%) and Camp Lake Inc. (Walker and Markham) (5%). Gary Goldman was the limited partner of Camp Ltd., owning a 15% Partnership interest. However, Goldman's liability was limited to his $150 capital contribution, and he had no obligation to make additional contributions. Thus for all practical purposes, all of these entities were owned by Walker and Markham.[3]
 
 
 4
 Leisure Lake Subdivision was to be developed as a recreational area and campsite, and the promoters planned to use land-holding trusts as the vehicle through which to purchase the property and then subdivide and sell it to individual lot buyers. Accordingly, three subdivision trusts were created in August 1972 and May 1973. The original landowners accepted a "first beneficial interest" in each trust, and Walker, Leisure Property Systems, Inc. and Camp Ltd. held second or "final beneficial interests." Plaintiff, Continental, agreed to act as trustee, which involved holding legal title to the land, executing installment sales contracts to lot buyers and collecting the lot buyers' installment payments. The trust estate consisted of the land and the proceeds of sale received from the lot buyers.
 
 
 5
 The promoters originally envisioned that improvement of the property would proceed simultaneously with sales to lot purchasers. Rather than rely upon lot buyer payments as the source of financing for the improvements, the promoters arranged for a loan from the Continental Bank for this purpose. On May 18, 1973, Continental, on its own behalf and as agent for the Bank of California, entered into a loan agreement with Camp Lake Inc. committing a total of $1,200,000 to the project.[4]
 
 
 6
 Camp Lake Inc., as borrower, was the only entity entitled to obtain the loan proceeds, which it could draw upon request. Apparently monthly requests were anticipated. However, disbursements were limited in amount to the "maximum borrowing base" at the time of each request, a figure tied to a percentage of the revenue coming into the Leisure Lake Subdivision trusts from lot buyers and to similar funds attributable to another Missouri project, Lake Sherwood A.[5]
 
 
 7
 Systems was the Walker/Markham entity charged with improving the property.[6] In order to enhance the property's attractiveness to lot buyers, the promoters decided to obtain bonds for certain major improvements.[7] While all improvements were to be financed by the loan proceeds, only certain improvements were to be bonded. Furthermore, the bonds were issued without a "set-aside letter" which would have required the lender or developers to set aside or designate specific funds for construction of the bonded improvements. In the absence of a set-aside or similar provision, Camp Lake Inc. was free to allocate the loan funds however it saw fit to implement the purpose of the loan, i. e., "for developing and promoting the sale of lots."
 
 
 8
 On May 11, 1973, American as surety executed five bonding agreements naming Systems as principal and Continental and Camp Ltd. as obligees.[8] The bond agreements incorporated five construction contracts[9] in which Systems undertook "to complete as soon as possible" the "necessary" water system, lake construction, sewer system and four comfort stations, road system, swimming pool and pavilion for the property. At the same time, Walker, Markham, Camp Lake Inc. and Systems agreed to indemnify the surety in the event of its liability for the principal's default.
 
 
 9
 Continental had disbursed over $700,000 of the loan proceeds when, in August 1973, the promoters realized that lot sales were not progressing because prospective buyers were reluctant to purchase before completion of the improvements. Two hundred nineteen lots had been sold, but the costs of promoting the project had apparently become prohibitive. Mr. Walker decided to cease all sales efforts until the improvements had been constructed, on the theory that a greater percentage of prospective buyers would then purchase lots. He informed Continental of this decision, and lot sales ceased by September 1973.[10]
 
 
 10
 The banks then participated with the developers in extensive efforts to obtain refinancing for the project so that funds would be available for construction of the improvements. Under the original loan agreement, the lending limit was tied to revenue from lot buyers. Thus when sales ceased, the "maximum borrowing base" for loan disbursements stabilized, and additional Continental loan funds were not available for development. Systems stopped work on the improvements shortly thereafter.
 
 
 11
 By January 1975 refinancing negotiations had broken down.[11] Systems had not resumed work on the improvements, and subcontractors had filed mechanics' liens. In February 1975 Continental notified American that Systems was in default.
 
 II.
 
 12
 The surety concedes that its principal did not complete the bonded improvements but nevertheless denies liability on two bases. First, American raises defenses which it contends Systems could have raised in a suit on the underlying construction contracts. American relies on the doctrine that the surety's liability is measured by that of the principal, and if the principal is discharged from its bonded obligation, the surety's liability terminates. Bolivar Reorganized School Dist. No. 1 v. Am. Surety Co. of N. Y., 307 S.W.2d 405, 410 (Mo.1957); Watkins v. Lankford, 363 Mo. 1046, 1053, 256 S.W.2d 788, 793 (1953).
 
 
 13
 In addition, American raises defenses on the bonds themselves, contending that the bonded obligations were wrongfully increased in scope, or, in the alternative, that Systems (and therefore American) had been released from any liability for default. We consider these issues seriatim.
 
 
 14
 American first alleges that the construction contracts were too vague and indefinite to be enforced, as they required Systems only to complete "the necessary" improvements without reference to actual plans and specifications. "A promise to be consideration for the promise of another must be definite and certain." Burger v. City of Springfield, 323 S.W.2d 777, 783 (Mo.1959). However, indefiniteness can be cured by the subsequent conduct of the parties, and as in this case, once an indefinite promise has been partly or wholly performed, the contract becomes sufficiently clear and binding upon all parties. 1 WILLISTON ON CONTRACTS § 49 (1957). Accord, Phillips Petroleum Co. v. Buster, 241 F.2d 178, 183 (10th Cir.), Cert. denied, 355 U.S. 816, 38 S.Ct. 18, 2 L.Ed.2d 33 (1957); Veterans Linoleum & Rug, Inc. v. Tureen, 432 S.W.2d 372, 375 (Mo.App.1968).[12]
 
 
 15
 Next American asserts that the construction contracts were void for lack of consideration. Continental, Camp Lake Inc. and Systems were parties to these agreements, and Continental merely agreed to accept and execute sales contracts when these were presented by Camp Lake Inc. American urges that the subdivision trust agreements already required Continental to perform this service, and that a promise to perform a preexisting duty does not constitute consideration for a return promise. See J. Calamari and J. Perillo, THE LAW OF CONTRACTS §§ 61, 62 (1970).
 
 
 16
 This contention did not prevent American from accepting over $4,600 in premiums, and on this basis the district court found sufficient consideration to hold the surety liable for its own absolute and unconditional guaranty. Furthermore, by virtue of the developers' assignments of their beneficial interests in the 1972 and 1973 trust agreements, only Continental was entitled to the benefits derived from execution of sales contracts under the terms of the trusts. It is doubtful whether in these circumstances Continental in fact owed a preexisting duty to any third person to execute sales contracts. Finally, in the three-party construction agreements, Systems received new benefits from both Continental and Camp Lake Inc. Camp Lake Inc. promised to present sales contracts to Continental, and the bank was required to execute them upon presentation. By a separate agreement, for every such contract Systems received a substantial commission as marketing agent. Thus Systems received a valuable right to compel presentation and execution of these contracts so it in turn could receive its commissions.
 
 
 17
 American next complains that Continental wrongfully released job funds which had allegedly been set aside to pay for construction. The district court correctly found that no set-aside commitment had been included in the bonding agreements, construction agreements or any other document. Moreover, we find no evidence in the record that Continental acted in bad faith in releasing funds.[13]
 
 
 18
 American also asserts that Continental breached the five construction contracts by failing to pay Systems before or during completion of construction, thereby forcing Systems into default. Recognizing that neither the bond agreements nor the construction contracts contain any provision for payment to Systems, American urges that payment was an implied condition of Systems' obligation to build the improvements.
 
 
 19
 This argument would be more persuasive had Systems been an independent general contractor unrelated in ownership and interest to the other Walker/Markham organizations engaged in developing and profiting from the project. Nevertheless, in practice, Camp Lake Inc. did allocate funds from the Continental loan to Systems for construction purposes. However, while one purpose of the loan was to pay for construction of the bonded improvements, Continental, in disbursing funds at the request of Camp Lake Inc., fulfilled all of its obligations under the loan agreement. Continental had no duty, implied or express, under the loan, bond or construction agreements to pay Systems directly for any purpose. In fact, only Camp Lake Inc. had the right as borrower to draw upon the loan.[14]
 
 
 20
 Mr. Walker, by deciding to stop selling lots, was directly responsible for the unavailability of further funds under the May 18, 1973 loan commitment which limited disbursements by the maximum borrowing base formula. Even if Mr. Walker's action could be construed as a wrongful act by Camp Lake Inc. (of which Walker owned 80%), against Systems (of which Walker owned 80%), and therefore a breach of the construction agreements, such default by Camp Lake Inc. would not extinguish the surety's liability to Continental. "Where two or more obligees are named in the bond, each has a separate right to recover thereon in the event of a breach." Curtis v. Tozer, 374 S.W.2d 557, 588 (Mo.App.1964). Continental and Camp Lake Inc. had severable and distinct interests in the construction contracts, as did Continental and Camp Ltd. in the bond agreements. Therefore, Continental's right to enforce these agreements could not be defeated by the acts of its co-obligees. See J. Calamari and J. Perillo, THE LAW OF CONTRACTS § 334 (1970).[15]
 
 
 21
 With respect to the bond agreements, American charges that the work undertaken by Systems was materially increased in scope without the surety's consent after the bonds had been issued. As support for this contention, American cites the deposition of Karl Hansen who supervised the early stage of the project.[16]
 
 
 22
 The liability of a compensated surety is discharged if the principal and creditor agree without the surety's consent to any alteration of the principal's contractual duty resulting in a material increase in the surety's risk. RESTATEMENT OF SECURITY § 128(b) (1941). However, the testimony of Mr. Hansen, who had prepared the initial cost estimates for the bonded improvements, merely describes unanticipated costs attributable to the original plans. This testimony does not indicate any alteration in the nature of the work or increases in the scope of Systems' undertaking. Therefore the record does not establish any modification of the principal's duty which materially increased the surety's risk. Id., Comments b, d, f.
 
 
 23
 During the refinancing efforts undertaken after lot sales ceased, the banks and developers settled claims arising out of the May 18, 1973 loan commitment. Camp Lake Inc. was by then in default as borrower. On June 20, 1975, Systems, Camp Ltd., Mrs. Markham, and Richard Walker and his wife, as "Guarantors," together with the banks executed a mutual release agreeing to "release, hold harmless and indemnify the Guarantors from any and all liability, damages and expenses incurred by the Guarantors as a result of the Guarantors entering into and executing the Leisure Lake Loan Agreement and related documents."
 
 
 24
 We agree with the district court that the language "Leisure Lake Loan Agreement And related documents " refers to the security agreement and guaranty which were executed simultaneously with the May 18, 1973 loan and which served as collateral. The release was not intended to relieve Systems of its obligation to complete improvements or American of its liability on the bonds. See Williams v. Riley, 243 S.W.2d 122, 124 (Mo.App.1951):
 
 
 25
 (A) release which is confined by its terms to claims or demands arising out of a specific matter will be restrained in its effect to the purposes of the bargain; and any language general in form, when used in connection with such specific matter, will be presumed to have been used in subordination to it, and will be construed and limited accordingly.
 
 
 26
 Accord, Drake and Beemont Mutual Aid Soc. Against Fire & Lightning v. United States, 330 F.2d 548, 553 (8th Cir. 1964).
 
 III.
 
 27
 While we agree with the district court that American is liable on the bonds, we remand for redetermination of the proper measure of damages owed by the surety for the principal's default.
 
 
 28
 The district court determined that the amount in unpaid mechanics' liens and the overall cost to complete all of the improvements based on 1977 cost figures exceeded $661,000, the combined face amounts of the bonds. He therefore ordered American to pay the entire amount of the bonds to Continental.
 
 
 29
 This measure of the surety's liability is erroneous in three respects. First, each bond is a separate undertaking specifying a particular kind of improvement, and each must be considered independently of the others. The record contains some evidence that substantial progress toward completion of certain improvements had been accomplished by the time Systems stopped working.
 
 
 30
 In addition, the bank is not entitled to the cost of completing the improvements without a corresponding adjustment in that amount for the price which would have been paid to Systems for the remaining work. The usual measure of damages recoverable against a contractor which has abandoned its undertaking or failed to complete construction is the amount above the contract price that it costs the owner to complete the structure in accordance with the terms of the contract. 13 Am.Jur.2d Building and Construction Contracts § 78 (1964). See Samuels v. Illinois Fire Ins. Co., 354 S.W.2d 352, 357 (Mo.App.1961), "the reasonable cost of reconstruction and completion in accordance with the contract * * * ." See also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. D & L Construction Co., 353 F.2d 169, 176 (8th Cir. 1965), Cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 539 (1966), "the full amount of allowable completion costs and deduct therefrom the unpaid amount of the (contract) price and allow the difference to the extent that such net figure falls within the bond coverage provided." This measure of damages reflects the obligee's right "to compensation by way of damages to put it in the position it would have occupied if the (principal) had faithfully fulfilled its contract * * * ." Id.
 
 
 31
 Finally, we do not agree with the district court that the cost of completion should be determined as of the 1977 date of trial. The surety's liability on the bonds arose at the time of Systems' default. Bloom v. Bender, 48 Cal.2d 793, 799, 313 P.2d 568, 572 (1957). The cost of completing the principal's obligations similarly must be ascertained as of the date of the default. Miracle Mile Shopping Center v. Nat'l Union Indemnity Co., 299 F.2d 780, 783 (7th Cir. 1962).[17]
 
 
 32
 Thus on remand, the district court must determine the date of Systems' breach, the cost to complete each of the bonded improvements as of that date, plus the amount of unpaid mechanics' liens thereon. It should deduct from that total the amounts Systems would have been paid had it satisfactorily completed each of the improvements. The net figure for each improvement may not exceed the face amount of the bond issued for that particular improvement.[18]
 
 
 33
 Affirmed in part, reversed in part, and remanded for additional proceedings consistent with this opinion.
 
 
 
 [1]
 The opinion of the Honorable James H. Meredith, Chief Judge, is reported at 462 F.Supp. 123 (E.D.Mo.1978)
 
 
 [2]
 Camp Lake Inc. is a Missouri corporation, and Camp Ltd. is a California limited partnership. Systems, the principal whose bonded obligations are the subject of this lawsuit, is a California corporation. Walker and Markham also formed Leisure Property Systems, Inc., a Missouri corporation
 
 
 [3]
 John Markham died in May 1973, and the parties do not indicate whether others have succeeded to his interest in the Walker/Markham organizations. The record discloses that after May 1973 Richard Walker controlled Camp Lake Inc., Camp Ltd. and Systems and that he made the decisions on behalf of those entities which are relevant to the outcome of this case
 
 
 [4]
 The loan was to be repaid from lot buyer payments received by the subdivision trusts. Walker, Systems and Camp Ltd. assigned their final beneficial interests in the trust funds to Continental. Thus revenue received by the trusts was allocated first to Continental to repay the loan, next to the original landowner first beneficiaries, and any remaining funds were also the property of Continental by virtue of the developers' assignments. Continental also received a security interest in executed sales contracts in the Leisure Lake project and in another development project in Missouri known as Lake Sherwood A. In addition, a guaranty document was executed, binding Systems, another California partnership, and Camp Ltd., as well as Walker, Markham and their wives as guarantors of Camp Lake Inc.'s obligations as borrower under the loan agreement
 
 
 [5]
 Thus if lots in these two projects did not sell, Continental could not disburse loan funds
 
 
 [6]
 The loan proceeds obtained by Camp Lake Inc. were to be used for "developing and promoting the sale of lots." Systems was not only charged with improving the property, but by arrangement with Camp Lake Inc. and Camp Ltd., Systems was to act as "marketing agent" for which it would receive substantial commissions from the trusts as sales contracts were executed
 
 
 [7]
 In their deposition testimony, Gary Goldman and Richard Walker emphasized that as promoters of the project they obtained the bonds to serve as an inducement to lot buyers who might otherwise decline to purchase undeveloped property. These witnesses specifically denied that the banks had any requirement in connection with the loan agreement that bonds be obtained to cover improvements
 
 
 [8]
 Continental was named on the bonds as "trustee." However, the terms of the bonds did not specify whether Continental was an obligee in its capacity as trustee under the subdivision trusts or as trustee for the lot purchasers. We do not consider this issue relevant to the question of American's liability. Clearly Continental as a named obligee on the bonds had standing to bring this lawsuit. Whether Continental should retain the funds as trustee under the subdivision trusts or instead hold them for the lot purchasers, as the district court determined, is not properly the concern of the surety. Furthermore, the bank and lot purchasers have not appealed the portion of the district court's decision ordering Continental to hold the funds in trust for the lot buyers. Distribution of the funds in this respect is therefore not an issue before this court
 
 
 [9]
 Systems, Continental and Camp Lake Inc. were the parties to the construction contracts
 
 
 [10]
 Mr. Walker apparently made this decision in his capacity as the controlling owner of all three entities, and all were directly interested in the decision to cease sales. Camp Ltd. was the developer. Camp Lake Inc. was a general partner of Camp Ltd. and was the borrower named on the Continental loan. Systems was in control of sales as marketing agent and was also in charge of improvements. Gary Goldman described the decision as follows:
 (Mr. Walker) and/or Mr. Hansen went in to see Dick Fister at Continental Bank to explain what the problems were and why the problems existed and advised the bank that we were going to, or both banks, that we were going to close down sales or should close down sales even though we were we can probably continue to sell because basically all we were doing was trading dollars. * * * The decision to cut sales from a technical sale, the sales agent was Systems, if you recall, Leisure Properties, Inc.; as a matter of fact, it was all, the parties were relatively the same parties, as you well understand, although not necessarily limited partners, and so forth.
 
 
 [11]
 During the refinancing negotiations, the banks, the developers and Systems cancelled the original loan agreement, and executed a release on June 20, 1975, relieving the guarantors of the loan from any liability incurred in connection with "the Leisure Lake Loan Agreement and related documents."
 
 
 [12]
 Moreover, the district court's finding that the contracting parties fully understood what the reference to "necessary" improvements encompassed is not clearly erroneous. And in fact detailed plans and specifications were prepared, and Systems completed substantial work on the improvements
 
 
 [13]
 The surety filed a third-party complaint against Continental on this and similar theories which the district court properly dismissed for failure to state a claim for relief
 In addition, the district court did not err in denying American's demand for a jury trial asserted after Continental amended its complaint. American had waived a jury with respect to the original complaint, and new or additional legal issues were not raised in the amended version. See Trixler Brokerage Co. v. Ralston Purina Co., 505 F.2d 1045, 1049-50 (9th Cir. 1974); William v. Farmers and Merchants Ins. Co., 457 F.2d 37, 38 (8th Cir. 1972). American had no right to a jury trial with respect to equitable issues raised in the amended complaint. See generally, Simler v. Conner, 372 U.S. 221, 222-23, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963).
 
 
 [14]
 On this point, Gary Goldman testified, "I don't believe the bank owed Systems any money because I don't believe that Systems had a direct claim on the bank for funds."
 
 
 [15]
 American entered into the bond agreements with full knowledge of the interrelationship among the Walker/Markham organizations. The surety issued the bonds because it knew that Walker and Markham were "the main parties in interest," and it considered them successful land developers. American now ignores the identity of ownership and intertwined interests connecting Systems with Camp Lake Inc., the only party responsible for making payments to Systems. We decline to hold that a wrong was perpetrated upon Systems for which the surety should be relieved of liability on the bonds under these facts
 
 
 [16]
 Karl Hansen served as president of both Camp Lake Inc. and Systems after Mr. Markham's death
 
 
 [17]
 In the absence of a provision in the bond agreements requiring notice to the surety upon the principal's default, the surety is not discharged by the obligee's failure to communicate such notice. RESTATEMENT OF SECURITY § 136 (1941). Nevertheless, the obligee may not delay before notifying the surety and then insist that the measure of the surety's liability includes escalated costs arising in the interim between default and demand
 
 
 [18]
 The district court granted attorney fees to Continental and an intervening class of lot purchasers. American has contested the award. Continental has not cited any provision in the bond agreements or under Missouri law which would support the court's authority to award attorney fees in a case of this kind. However, as the district court has deferred determination of the amounts to be awarded until after this appeal is concluded, the issue is not before us at this time. On remand, the district court should determine whether under Missouri law or the parties' contracts, the surety can be required to pay attorney fees, and if so, whether the fees are to be deducted from the funds to be held in trust by Continental for the lot buyers or are to be paid by American in addition to the amounts due under the bonds