834 F.2d 1393
 RED LAKE BAND OF CHIPPEWA INDIANS, Red Lake, Minnesota, and
Roger A. Jourdain, Chairman, Red Lake, Minnesota, Appellees,
v.
Earl J. BARLOW, Area Director, Minneapolis Area Office, and
Rex Mayotte, Superintendent, Red Lake Agency,
Bureau of Indian Affairs, United States
Department of Interior, Appellants.
 No. 85-5272.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 19, 1987.
Decided Dec. 9, 1987.
 
 Edward J. Shawaker, Washington, D.C., for appellants.
 Rodney E. Edwards, Duluth, Minn., for appellees.
 Before HEANEY and FAGG, Circuit Judges, and WOODS*, District Judge.
 HEANEY, Circuit Judge.
 
 
 1
 The Red Lake Band of Chippewa Indians (Band) sued the Secretary of the Interior,[1] seeking the transfer of funds from a trust account, established to operate a sawmill on the Red Lake Indian reservation, to the Band's general trust account. The Secretary administers both accounts pursuant to Acts of Congress. The district court entered an injunction, dated May 30, 1985, requiring the transfer. We reversed and remanded but retained jurisdiction. See Red Lake Band of Chippewa Indians v. Barlow, 787 F.2d 1235 (8 Cir.1986) (per curiam). On remand, the district court[2] granted the Secretary's motion to dismiss and ordered the transferred funds returned to the "sawmill account." The matter now again comes before this Court after the filing of supplemental briefs by the Secretary and the Band. We reverse and remand.
 
 I. BACKGROUND
 
 2
 In its order of May 30, 1985, the district court required the transfer of over $800,000 from the "sawmill account"[3] to the Band's general trust account.[4] We reversed the district court because we found the district court's order "devoid of factual findings and legal justifications." Id. at 1236-37. We retained jurisdiction and instructed the district court to take additional evidence if needed and "to make whatever decision it considers appropriate." Id. at 1237. The master appointed by the district court was "directed to continue to supervise negotiations between the parties with respect to the future use of the Tribe's timber resources and with respect to the operation of the sawmill." Id. at 1237.
 
 
 3
 On remand, the district court granted the Secretary's motion to dismiss because it found no statutory authority for the transfer of the funds from the "sawmill account" to the Band's general account. It, therefore, ordered the funds to be returned to the "sawmill account."
 
 II. DISCUSSION
 
 4
 The Secretary contends that (1) this appeal is now moot because the Bureau of Indian Affairs has received the relief it had sought, or (2) the district court properly decided that Congress imposed no "mandatory duty" on the Secretary to transfer the funds in the "sawmill account" to the Band's general account.
 
 
 5
 The Band contends that (1) the district court's order of March 13, 1987, did not comply with the directions in our first opinion, and (2) the Secretary has a statutory duty to transfer the money in the "sawmill account" to the Band's general account.
 
 
 6
 Contrary to the Secretary's claim, this appeal is not moot. We expressly retained jurisdiction in our previous decision, and a live controversy remains before us. We see no purpose in requiring the Band to initiate its own appeal from the district court's most recent order. The issues presently on appeal are legal in nature, and further development of them would be fruitless.
 
 
 7
 Contrary to the Band's claim, the district court complied with the directions of our previous decision. Id. at 1237.
 
 
 8
 The more difficult issue is whether the Secretary may have to transfer the funds in the "sawmill account" to the general account to remain in compliance with the Act of May 18, 1916, ch. 125, 39 Stat. 123, 137, amended by Act of August 3, 1956, ch. 927, 70 Stat. 982, and Act of August 28, 1958, 72 Stat. 958. As we explain below, the amendments to the Act of 1916 expanded the Secretary's authority to manage the Red Lake Forest and the funds generated by it in a way beneficial to the Band. To determine what would be most beneficial to the Band and what must be done with the funds in the "sawmill account," further factual findings are necessary.
 
 
 9
 The purpose of the 1916 Act was to create "a forest reserve within the boundaries of the Red Lake Indian Reservation." Red Lake Band of Chippewa Indians, at 1236. Paragraph 17 of the Act as amended in 1956 requires the Secretary to administer the forest preserve "in accordance with the principles of scientific forestry that will encourage the production of successive timber crops for the benefit of the Indians of the Red Lake Band." The Act authorizes the Secretary to "harvest, sell, and manufacture" timber; to "establish nurseries" and provide for reforestation; to "construct and operate sawmills and other facilities for the manufacture [of timber] into marketable products;" to obtain additional timber from other sources "as in his opinion may contribute to the profitable operation of such sawmills and other facilities as a tribal enterprise;" and to employ workers to carry out the purposes of the Act.
 
 
 10
 Paragraph 19 of the 1916 Act as originally enacted (and unaltered by the 1956 amendment) explained what was to be done with the money after the payment of the expenses:
 
 
 11
 After the payment of all expenses connected with the administration of these lands as herein provided, the net proceeds therefrom shall be covered into the Treasury of the United States to the credit of the Red Lake Indians and draw interest at the rate of four per centum per annum. The interest on this fund may be used by the Secretary of the Interior in such manner as he shall consider most advantageous and beneficial to the Red Lake Indians. Expenditure from the principal shall be made only after the approval by Congress of estimates submitted by the said Secretary.
 
 
 12
 Under this section, the Secretary had discretion to use money generated by management of the forest to: pay the "expenses connected with the administration" of the lands; and use the interest from the net proceeds in a way "most advantageous and beneficial" to the Band.
 
 
 13
 Under the original 1916 Act, however, Congress had to act before any of the principal in the treasury could be spent. In subsequent years, Congress did name specific ways to use the principal. It provided that the principal should be used to establish and maintain sawmills. See, e.g., section 10 of the Act of June 30, 1919, ch. 4, 41 Stat. 3, 15 (permitting Secretary to use $10,000 of the principal for the purposes set out in the 1916 Act and providing authorization of payment for "expenses of logging, booming, towing, and manufacturing timber at said mill"). Congress also occasionally authorized payments out of the proceeds from the forest products to individual members of the Red Lake Band, per capita. See, e.g., Act of June 14, 1932, ch. 254, 47 Stat. 306 ($25 payment); Act of June 4, 1956, ch. 361, 70 Stat. 245 ($100 payment).
 
 
 14
 Congress eventually decided that the Secretary should be given more discretion over the funds in the treasury. See S.Rep. 1871, 85th Cong., 2d Sess. (1958). Thus, in 1958, Congress amended Paragraph 19 of the 1916 Act. Act of August 27, 1958, 72 Stat. 928. In regard to proceeds and expenses, the amendment stated:
 
 
 15
 After the payment of all expenses connected with the administration of these lands as herein provided, the net proceeds therefrom shall be covered into the Treasury of the United States to the credit of the Red Lake Indians and draw interest at the rate of four per centum per annum. Any part of such fund or the interest thereon that is in excess of reserve and operating requirements, as determined by the Secretary of the Interior, may be distributed per capita to the members of the Red Lake Band upon request of the tribal council and approval by the Secretary.
 
 
 16
 The Secretary and the Band agree that one of the main purposes of the 1958 amendment was to allow the Secretary to distribute funds in the treasury per capita upon the request of the tribal council of the Band. See S.Rep. No. 1871, 85th Cong., 2d Sess. at 1. A per capita distribution, however, is not in issue in this case because the Band has not requested such a distribution.
 
 
 17
 The Secretary contends that he is under no obligation to do anything else at this time with the funds. According to the Secretary, the funds in the sawmill operating account are there in conformity with the Act because they are being held to the credit of the Band, are collecting interest, and are available for any future use at the sawmill. In addition, the Secretary contends that this interpretation of the Act should be given great weight because it is a longstanding one. See, e.g., Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Chevron v. Natural Resources Defense Council, 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984).
 
 
 18
 The Band, on the other hand, argues that it is entitled to mandamus relief under 28 U.S.C. Sec. 1361 in the form of the transfer of the funds to its general account.[5] The Band argues that the sawmill has been closed since 1984 and will never reopen because it has been unprofitable. Therefore, the sawmill account serves no economic purpose and thus can no longer be to their "credit" as required by the Act.
 
 
 19
 We believe the Secretary has read the 1916 Act too narrowly, and the Band too broadly. We agree with the Secretary that the Bureau of Indian Affairs cannot, at this juncture, simply be required to transfer money from the sawmill account to the general account. Yet, if in fact the sawmill is no longer economically viable, the Secretary may be required to use the funds in the "sawmill account" for other forestry purposes, or in the event that it is impossible, to transfer the funds to the Band's general account to be used for the Band's general welfare.
 
 
 20
 The specific purposes of the 1916 Act are readily identifiable. The Act was designed to facilitate the administration of the "forest reserve" or the "lands" of the forest reserve to make it an economically viable and sustainable enterprise which would provide work, training, and income for the members of the Band. The sawmill is only one manner in which money could be generated or spent in pursuing the purposes of the Act. The Act refers to using "net proceeds" to pay "all expenses connected with the administration of these lands " (emphasis added). The Act nowhere restricts use of the proceeds to the operation of a sawmill. And, in fact, the Act specifically permits use of funds "to establish nurseries" and to "provide for reforestation."
 
 
 21
 The Secretary clearly was given expanded authority under the 1956 and 1958 amendments to manage the forest reserve and the funds generated by it. The 1956 amendment of Paragraph 17 permitted the Secretary to use "[a]ny proceeds derived from the sales of timber or timber products" to pay for activities authorized by the Act, "including construction costs." Previously, the Secretary had to submit cost estimates for the approval of Congress. The 1958 amendment of Paragraph 19 removed the sentence stating that "[e]xpenditure from the principal shall be made only after the approval by Congress of estimates submitted by the said Secretary." Thus, after the 1958 amendment, the Secretary had broad discretion to use the funds in the treasury for forestry purposes.
 
 
 22
 The existence of the "sawmill account" does not prevent the Secretary from using funds in it for general forestry management purposes. The "sawmill account" is a device of administrative convenience. Nothing in the Act indicates that this account is inviolate or that the funds in it cannot be used for general forestry purposes.
 
 
 23
 In addition to enumerating specific ways which the forest preserve and the funds from it should be managed, the Act does something else: it places the federal government in a fiduciary relationship with the Band. Thus, the Secretary has a duty to manage the forest preserve and the funds generated by it in a way beneficial to the Band.
 
 
 24
 United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), is instructive on this point. Mitchell involved a suit for damages brought by the Quinault Tribe and individuals with interests in allotments of land. The damages sought were for mismanagement of timberlands on the Quinault Indian Reservation. The Supreme Court upheld a Court of Claims ruling which permitted the suit.
 
 
 25
 In determining that the federal government could be liable, the Mitchell Court first determined that the federal government had a specific duty owed to the claimants for managing the forest. The Court interpreted the Act of June 25, 1910, Secs. 7, 8, 36 Stat. 857, as amended, 25 U.S.C. Secs. 406-407, and various other statutes and regulations as establishing "the 'comprehensive' responsibilities of the Federal Government in managing the harvesting of Indian timber." Id. at 222, 103 S.Ct. at 2970 (citing White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980)). The Court went on to say that the "statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." Id. 463 U.S. at 224, 103 S.Ct. at 2971-72.
 
 
 26
 The 1916 Act clearly imposes duties upon the federal government with regard to the management of the forest reserve: building sawmills, establishing nurseries, reforestation, and managing the proceeds from such projects. As in Mitchell, "[a]ll the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary [the Band], and a trust corpus (Indian timber, lands, and funds)." Id. at 225, 103 S.Ct. at 2972. We thus do not hesitate in finding that a trust relationship exists between the federal government and the Band with regard to managing the forest reserve and any revenue from it.
 
 
 27
 The Secretary suggests that its duty as trustee can be carried out by simply allowing the funds to idle in the sawmill trust account until the day when the sawmill again becomes profitable. At present, however, the limited record before us gives no indication that this day will come. For example, the Band submitted the affidavit of Oran D. Beaulieu, a member of the Band living on the Red Lake Reservation, who visited the sawmill on August 16, 1986. Beaulieu observed that:
 
 
 28
 the sawmill buildings had been broken into and vandalized, machinery broken into and destroyed, weeds and trees had grown up around machinery and lumber. There was no visible signs of any manufacturing activity having been conducted at the Red Lake Mill for some time. In fact, no manufacturing activity has been conducted at the Mill since my first inspection in October, 1984, as evidenced by the fact that physical equipment and logs have not moved in over two years.
 
 
 29
 We believe the Secretary must actively seek the best use of the funds to ensure that they are in fact used "for the benefit" of the Band. Congress did not intend the funds to lie dormant in the treasury.
 
 
 30
 In remanding the first time, we had anticipated that the district court would conduct an evidentiary hearing to determine whether the broad purposes of the Act were being served by leaving the funds in the sawmill account for a possible reopening of the sawmill. Such fact-finding must now be undertaken. The Secretary has expressed a willingness to pursue such a course. As he stated in his brief in the initial appeal:
 
 
 31
 [t]his case should be put on a regular basis. In the past, there has been virtually no formality in hearings or in decisions. The future of the Red Lake Sawmill presents difficult questions. If recourse to the courts is necessary, some degree of formality is necessary. On remand, we trust that the district court will hold formal hearings, with proper notice and procedures. If testimony is received, it should be duly sworn, and with opportunity for formal examination and cross-examination. And if any injunction is issued, it should be accompanied by a statement as to the court's factual and legal reasoning.
 
 
 32
 We agree with this statement. If, after receiving evidence, the district court determines that the sawmill can be economically viable, either now or in the near future, the funds in the "sawmill account" should remain there and be used, as soon as practicable, for sawmill purposes. If the district court determines that the sawmill is not now economically viable and will not be in the near future, the district court should determine whether the funds can be used for more general forestry or land management purposes which will benefit the Band. If it answers this question in the affirmative, the funds may remain in the sawmill account to be used as soon as practicable for general forestry or land management purposes.
 
 
 33
 In the event that forest or land management cannot be undertaken in a manner beneficial to the Band, more far-reaching measures must be undertaken by the federal government to meet its trust obligations. The funds in the "sawmill account" must be transferred to the general account,[6] with the Secretary to have discretion to use the funds in accordance with 25 U.S.C. Sec. 155.[7]
 
 
 34
 This result would be necessary because the federal government's trust obligations created by the statute must take primacy over any unattainable statutory objectives of forestry management. Clearly, the government may neither allow the funds in the treasury to remain there unproductive nor may it squander the funds on uneconomical forestry or land projects. To do so would expose the federal government to liability for breach of its duty to manage revenue from forestry projects prudently. See Mitchell, 463 U.S. at 226-27, 103 S.Ct. at 2972-73 ("recognition of a damages remedy also furthers the purposes of the statutes and regulations, which clearly require that the Secretary manage Indian resources so as to generate proceeds for the Indians"). This result also comports with our duty to construe statutes such as this one liberally "with all doubts resolved in favor of the Indians." Preston v. Heckler, 734 F.2d 1359, 1369 (9th Cir.1984) (citing, e.g., Squire v. Capoeman, 351 U.S. 1, 6-7, 76 S.Ct. 611, 614-15, 100 L.Ed. 883 (1956)).
 
 III. CONCLUSION
 
 35
 This matter is remanded to the district court. It must first be determined whether a sawmill can be operated that will benefit the Band. If it can, the funds now in the "sawmill account" shall be used for that purpose. If the operation of a sawmill is not economically prudent, it must be determined if any forestry or land management projects could be undertaken to the benefit of the Band. If they can, the funds shall remain in the "sawmill account" for that purpose. If no forestry or land management projects would benefit the Band, the funds shall be transferred to the Band's general account to be used for the Band's general welfare in accordance with 25 U.S.C. Sec. 155.
 
 
 36
 FAGG, Circuit Judge, dissenting.
 
 
 37
 This appeal originated when the Secretary filed an interlocutory appeal from the district court's order requiring the transfer of funds. The Secretary claimed the injunction should be vacated because the district court failed to make adequate findings of fact and conclusions of law. We agreed the "order [was] devoid of factual findings and legal justifications for its decision," and remanded the case with directions that adequate findings and conclusions be prepared. On remand the district court made appropriate findings and conclusions, vacated the challenged injunction, and went on to dismiss the case with prejudice.
 
 
 38
 I do not believe the controversy concerning the transfer of funds should be considered in the context of this appeal. The district court's ruling on remand has resolved the Secretary's original contention in this case. The interlocutory appeal taken by the Secretary is now moot and should be dismissed.
 
 
 
 *
 The Honorable HENRY WOODS, United States District Judge for the Eastern District of Arkansas, sitting by designation
 
 
 [1]
 The named defendants are Earl J. Barlow of the Minneapolis Area Office, Rex Mayotte, the Superintendent of the Red Lake Agency, and the Bureau of Indian Affairs, Department of the Interior. For convenience only, we identify in this opinion the Secretary of the Interior as the principal defendant, although he was not formally named
 
 
 [2]
 This order was issued on March 13, 1987, by Judge Edward J. Devitt who had presided in this case after the retirement of Judge Miles W. Lord
 
 
 [3]
 There are apparently two "sawmill accounts". Account 7285 is the actual operating account and account 7785 holds the interest earned on the operating account. When we refer to the "sawmill account" we mean both of these accounts and any other account used to hold operating funds for or proceeds from the operation of the sawmill
 
 
 [4]
 The Secretary apparently maintains four general trust accounts in the name of the Red Lake Band. The one of primary concern here is the "Proceeds of Labor" account, 7284, maintained by the Secretary pursuant to 25 U.S.C. Sec. 155. These funds are "made available for expenditure, in the discretion of the Secretary of the Interior, for the benefit of the Indian tribes, agencies, and schools on whose behalf they are collected."
 
 
 [5]
 The Secretary contended in his brief on the initial appeal that the district court did not have jurisdiction under 5 U.S.C. Sec. 702 to order the transfer of funds from the "sawmill account" to the general account. According to the Secretary, it would be barred because this is a suit for damages. We disagree. In this action, the Band is seeking a transfer of funds from one account to another based on the claim that the Secretary has "failed" to fulfill his duty to manage funds held in trust for the Band. This action does not seek damages for such a failure, and therefore the actions of the Secretary are reviewable under 5 U.S.C. Sec. 702, see U.S. v. Mitchell, 463 U.S. 206, at 227, 103 S.Ct. 2961, 2973, 77 L.Ed.2d 580, or 28 U.S.C. Sec. 1362. See Moe v. Salish & Kootenai Tribes, 425 U.S. 463, 472-75, 96 S.Ct. 1634, 1640-42, 48 L.Ed.2d 96 (1976)
 
 
 [6]
 The Band could petition the Secretary for a per capita distribution of the funds in the "sawmill account". Such a distribution, however, is not necessarily mandated in the event that forest or land management projects cannot be carried out. The funds in the treasury are to the "credit" of the Band. And, the Act clearly gives the governing body of the Band the discretion to petition for a per capita distribution. If the Band determines that a per capita distribution is not prudent, the federal government will continue to hold the funds in trust for the Band, meaning that the federal government must continue to manage the funds in a way beneficial to the Band
 This interpretation also has merit because one of the recognized purposes of per capita payments from tribal funds was to weaken tribal organization and thereby achieve assimilationist goals. See F. Cohen, Handbook of Federal Indian Law, 550-51 (1982 ed.). And we must seek to follow, where permitted by statutory language, Congress' newer policy of encouraging "Indian automony, reservation self-government and economic self-development." Santa Rosa Band of Indians v. Kings County, 532 F.2d 655 (9th Cir.1975), cert. denied, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977), quoted with approval in Bryan v. Itasca County, 426 U.S. 373, 388 n. 14, 96 S.Ct. 2102, 2111 n. 14, 48 L.Ed.2d 710 (1976).
 
 
 [7]
 This outcome can be viewed in terms of common law trusts, as the Supreme Court did in Mitchell. 463 U.S. at 225, 103 S.Ct. at 2972. At common law, when an express trust failed because its original purpose became impossible to achieve, the funds would transfer to a resulting trust, and the court of equity would determine the "disposition of the subject-matter of the trust which has failed." Bogert, Trusts & Trustees, Sec. 468 (2d 3d. 1977); see also Continental Bank & Trust Co. v. American Bonding Co., 462 F.Supp. 123 (E.d. Mo.1978), reversed on other grounds, 605 F.2d 1049 (8th Cir.1979) (lending bank as trustee held funds for failed real estate venture in resulting trust for purposes consistent with the contract)