**ROSEBUD SIOUX TRIBE, Plaintiff,**

v.

**UNITED STATES of America, BUREAU OF INDIAN AFFAIRS, Defendant.**

**Civ. No. 86–3014.**

United States District Court,
D. South Dakota, C.D.

June 21, 1989.

---

Terry L. Pechota, Finch, Viken, Viken & Pechota, Rapid City, S.D., for plaintiff.

David L. Zuercher, Asst. U.S. Atty., Pierre, S.D., for defendant.

## MEMORANDUM OPINION

DONALD J. PORTER, Chief Judge.

On April 8, 1986, plaintiff Rosebud Sioux Tribe filed this action alleging that defendant United States through the Bureau of Indian Affairs (BIA) breached the trust obligation owed the Tribe. Specifically, the Rosebud Sioux Tribe claims that the BIA failed to adequately supervise economic development on the Rosebud Sioux Indian Reservation. The Tribe seeks monetary damages, declaratory relief, and a writ of mandamus to compel the BIA to issue regulations governing economic development on Indian reservations.

The parties obtained postponements of the trial date on several occasions and on November 6, 1987 filed a joint motion for submission of the case on a set of stipulated facts. The case then floundered, since the parties ultimately were unable to agree to a stipulation of facts. On November 3, 1988, this Court issued an order establishing a schedule for the submission of the case on briefs because the case presents primarily legal rather than factual issues and because the parties have indicated a desire to avoid trial of the case if possible.[1] The case now has been fully briefed and is ready for a decision. Because this Court lacks jurisdiction to grant the money damages requested and because a writ of mandamus is inappropriate in this case, this Court transfers the bulk of the case to the Claims Court for further proceedings.

## I. FACTS.

Plaintiff Rosebud Sioux Tribe is a federally recognized tribe with governmental responsibilities on the Rosebud Indian Reservation in the southwestern portion of South Dakota. Defendant United States through the Bureau of Indian Affairs assists and partially supervises the Tribe.

In February and March of 1984, officials of the Rosebud Sioux Tribe entered discussions with Harvey Greenwald, a non-Indian businessman, concerning business enterprises on the Rosebud Indian Reservation. Greenwald's elaborate plans for bringing prosperity to the depressed economy of the Rosebud Indian Reservation won over the support of then tribal chairman, Webster Two Hawk. Two Hawk introduced Greenwald to the Rosebud Tribal Council and

---

1. The United States has raised objections to resolving the merits of the case based on the file and briefing. The Rosebud Sioux Tribe has countered by arguing that the United States had already agreed to submit the case for decision without trial. Because this case can be disposed of based on purely legal issues that can be raised sua sponte, this Court need not resolve the merits of the allegations.

began negotiating a management agreement under which Greenwald would begin business on the Reservation.

On March 21, 1984, the Rosebud Tribal Council passed Resolution No. 84–60, which authorized Two Hawk to complete the execution of a management agreement with Greenwald. Initially, the Tribe believed that the federal government did not need to approve the management agreement with Greenwald.[2] The initial drafts of the management agreement, nonetheless, were submitted to BIA officials.

The draft of the management agreement went through formal BIA review, including review by BIA Area Director Jerry Jaeger and the Regional Office of the Solicitor of the United States Department of the Interior. These officials expressed reservations and made numerous suggestions for revisions of the initial management agreement. Among the BIA suggestions was that the background and credentials of Greenwald and his business be investigated.[3]

The BIA conducted a limited background check on Greenwald, but the search primarily was focused on whether Greenwald had any criminal convictions. The search revealed very little information about Greenwald, and BIA officials reported to the Tribe that it had scant information about Greenwald. Wilson Barber, who was the BIA agency superintendent for the Rosebud Indian Reservation at the time, met with Chairman Two Hawk and Greenwald in March of 1984. Barber purportedly asked Greenwald for financial documentation of Greenwald's assets and studies of the feasibility of the elaborate business plans. Barber also expressed concerns about the sweeping nature of the proposals and the legal ramifications. Greenwald never produced any financial reports, and the BIA did not press its request for financial documentation. Meanwhile, Greenwald and the Tribe had already begun to perform under the management agreement.

Chairman Two Hawk and Greenwald eventually incorporated nearly all of the suggestions made by BIA officials into a revised management agreement. The Tribal Council on May 23, 1984 enacted Resolution No. 84–121, which adopted the amendments to the management agreement and reauthorized the execution of the agreement. On June 11, 1984, BIA Area Director Jerry Jaeger met with Harvey Greenwald at a Tribal Council meeting and approved the amended management agreement. According to Jaeger, the Rosebud Tribal Council was pressuring the BIA to approve the management agreement with Greenwald.

The management agreement established a business network to control economic development on the Rosebud Indian Reservation. Greenwald himself had established a business called Rosebud Industries, Inc., which was to act as a financier and management consultant for three wholly-owned tribal businesses. These three tribal businesses, created pursuant to the management agreement, were Rosebud Mobile/Modular Homes, Rosebud Real Estate and Construction, and Rosebud Procurement and Fundraiser. The management agreement required Greenwald to provide at least $250,000 of initial financing to these three tribal companies. Greenwald had represented to tribal members that he was worth somewhere in the range of twenty million dollars and that he was interested in developing businesses on the Rosebud Indian Reservation to take advantage of tax shelters and deductions. Greenwald, through Rosebud Industries, Inc., was to provide financial advice and was to receive forty percent of the net profits derived from the operation of the three tribal companies. The management agreement also provided that, while no tribal assets were to be used in the industries,

---

2. The Secretary of Interior and Commissioner of Indian Affairs must approve contracts whereby a tribe grants a privilege or gives value to any person. 25 U.S.C. § 81.

3. Letter from Jean W. Sutton of the Regional Office of the Solicitor to Jerry Jaeger, Area Director of the BIA (May 15, 1984). The recommendations in Ms. Sutton's letter apparently were conveyed to the Tribe through a conference call on May 11, 1984.

the Tribe would enter into leases with Greenwald to provide assets for the three tribal entities.

To house the Rosebud Mobile/Modular Home business, the Tribe agreed to lease Greenwald the Commodity Program building in Antelope, South Dakota. The Tribe then moved the Commodity Program to a building in Rosebud and paid $18,000.00 to remodel the Rosebud building. The building in Antelope also had to be remodeled at a cost of $11,000.00 to house the planned construction of mobile homes. In exchange for the lease, Greenwald agreed to pay $7,000.00 per year on a loan that the Tribe had received from the Small Business Administration. The modular home business was short-lived, and Greenwald never made the $7,000.00 yearly payment.

The same unfortunate fate awaited Greenwald's other grandiose plans. Believing that the consolidation of a number of different tribal enterprises would yield substantial profit, Greenwald had devised a plan to use cattle from the tribal ranch to supply a tribally owned slaughterhouse and then to return beef products back to the tribal jail, hospital, nursing home, and schools. Greenwald, along with an associate by the name of Robert Wood, who was the primary owner of Dellwood Co., decided to purchase the financially troubled Fort Pierre packing plant called Cedar Breaks Beef. Greenwald had earlier secured without the knowledge of the Tribal Council a power of attorney from the Tribe dated March 26, 1984 and signed by Tribal Chairman Webster Two Hawk.[4] With the power of attorney in hand, Greenwald negotiated an agreement whereby Dellwood Co. bought Cedar Breaks Beef on behalf of the Tribe with the intention to donate shares of Cedar Breaks Beef to the tribal entities. Ultimately, twenty percent of the shares of Cedar Breaks Beef were donated to Rosebud Sioux Procurement and Fundraiser and allegedly thirty-six percent of the shares

were transferred directly to Indian individuals. Greenwald assumed a $175,000 indebtedness owed to the Small Business Administration and Bankwest as consideration for the purchase of the packing plant. As collateral for the arrangement, Dellwood Co. put up the deed to some land in Texas worth between $50,000 and $70,000. Cedar Breaks Beef failed, and Bankwest and the Small Business Administration absorbed much of the loss. The BIA was unaware at the time that the Tribe had purchased part of Cedar Breaks Beef.

Meanwhile, perhaps at the urging of Harvey Greenwald, the Rosebud Sioux Tribe's bank account containing over $2 million had been transferred from a Mission, South Dakota bank to Stockmens National Bank in Rushville, Nebraska without the knowledge of the Tribal Council. Coinciding with the transfer of the accounts to Stockmens National Bank, the bank made a number of personal loans to Webster Two Hawk and several other tribal council members. None of these loans were repaid. The bank also made an $8,000 loan on July 24, 1984 to Rosebud Sioux Real Estate and Construction to finance a gravel exploration and development enterprise that Harvey Greenwald spearheaded.[5] Apparently without the approval of the Tribal Council, $7,000 had already been supplied by the Tribe to Greenwald to finance the gravel exploration project, although the tribal constitution prohibited the use of tribal assets without Tribal Council approval. None of this money was returned, and the gravel exploration and development project also failed.

Yet another enterprise that Harvey Greenwald entered into on the Reservation was the buying and selling of hay. In 1984, a drought in Texas triggered an increased demand for hay from Texas ranchers. Greenwald borrowed money from the Tribe to set up an account to pay for the expenses of transporting hay to Texas.

---

4. Later, on August 21, 1984, Two Hawk signed yet another power of Attorney authorization for Greenwald.

5. As collateral for the $8,000 loan, the bank purported to accept assignment of a BIA con-

tract. Since this was a "638 contract" between the federal government and the Tribe, the assignment was ineffective without governmental approval. Public Law 93–638; 25 U.S.C. § 450f. The $8,000 loan was never repaid.

The Tribe never recovered this money and lost approximately $1,680 in this enterprise.

In addition, some time in the summer of 1984, Greenwald bought a corporation called Meco Corporation of Dallas as part of the tribal business. Meco apparently was a manufacturer of caps and gowns.[6] It is unclear how much, if any, money was lost by the Tribe in the purchase of Meco Corporation.

Greenwald also had plans to monopolize building on the Rosebud Indian Reservation through the Rosebud Real Estate and Construction Company. These plans also failed as Greenwald had difficulty securing housing contracts and complying with federal regulations. Greenwald apparently intended to control reservation irrigation projects as well. In addition, there are allegations that Greenwald and his business associate, Robert Wood, made illegal payments to certain individual Tribal Council members.

By July and August of 1984, Greenwald's plans already had begun to unravel, and skepticism was growing about Greenwald's business operations. Perhaps as early as July of 1984, Bureau of Indian Affairs officials became aware that Greenwald had been involved in questionable business dealings in the State of New Jersey. BIA officials, however, did not take any action at this time because Green-wald's business association with the Tribe already was coming to an end.

Meanwhile the Tribal Council found out after the fact about a number of Greenwald's transactions and about the two grants of power of attorney to Greenwald.[7] On October 12, 1984, the Tribal Council enacted Resolution No. 84–189 to establish the Tribal Investigative Committee to probe Greenwald's business dealings. In the course of its investigation the Tribal Investigative Committee discovered that there were a number of reports in East Coast newspapers concerning Greenwald's past business dealings. These newspaper articles revealed that Greenwald possibly was involved in a scheme to use notes from phony Carribbean banks to defraud New Jersey lenders.[8] In addition, Greenwald had been involved in a group of individuals who had secured a $5 million loan from the First National Bank of Chicago to finance construction of condominiums in Panama City, Florida. Although some condominiums ultimately were constructed, the First National Bank of Chicago never was repaid in full and there were allegations that Greenwald and others had skimmed substantial amounts of the loan for personal use. The most shocking newspaper articles concern purported attempts to assassinate Harvey Greenwald.[9]

After the Tribal Investigative Committee was established, Greenwald on October 15,

---

6. At the same time, Greenwald was urging the United Sioux Tribes and the BIA to invest $5 million to purchase the Dallas Cap and Emblem Company and to move its operations to South Dakota. In addition, Greenwald was exploring the possibility of obtaining a $12 million loan to build manufacturing plants for the Three Affiliated Tribes of the Fort Berthold Reservation in North Dakota.

7. The Tribal Council, however, had passed Resolution No. 84–60, which stated:
 ... the Rosebud Sioux Tribal Council authorizes the Chairman and Secretary of the Rosebud Sioux Tribe to complete the execution of all documents pertaining to the Management Agreement, and pertinent amendments; and that Harvey Greenwald be designated as representative for Rosebud Industries, Inc.
 The Regional Office of the Solicitor has opined that this Resolution may have authorized the Tribal Chairman to grant powers of attorney to Greenwald. Letter of Priscilla A. Wilfahrt to BIA Area Director Jerry Jaeger (January 10, 1985).

8. The Sunday Record, February 12, 1978, at A–1 and A–21; The Star–Ledger, (Newark, New Jersey) January 9, 1978, at 1, 5.

9. Greenwald reportedly was shot in the abdomen and seriously injured in an assassination attempt in front of his Oakland, New Jersey house on January 10, 1977. Greenwald also has stated that he was injured in apparent assassination attempts on August 8, 1977 and on November 22, 1977. This final episode occurred in an office building while Greenwald was preparing to give deposition testimony in an Internal Revenue Service criminal investigation. A bulletproof vest stopped two shots while a third bullet pierced Greenwald's arm. There remains some doubt whether all of these incidents took place as Greenwald describes them. The Sunday Record, January 8, 1978, at A–1, A–14; The New York Times, November 24, 1977, at B–2.

1984 wrote a letter withdrawing from the management agreement. On November 30, 1984 in Resolution No. 84–204, the Tribal Council dissolved the companies created by the management agreement and terminated the agreement. The Council later authorized the institution of legal action against Harvey Greenwald to recover damages and permanently barred him from the Reservation. Greenwald apparently has not been heard from since. The instant case then was instituted to recover from the BIA and United States damages caused by the failed business enterprises established by Harvey Greenwald and to compel the BIA to promulgate regulations concerning economic development on Indian reservations.

## II. JURISDICTION.

### A. Waiver of Sovereign Immunity.

■ The doctrine of sovereign immunity renders the United States immune from suit unless it consents to be sued. The terms of the consent define this Court's jurisdiction over a suit against the United States. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). Although federal law provides Indians special protections, the doctrine of sovereign immunity applies equally to suits brought by Indian plaintiffs. *United States v. Mottaz*, 476 U.S. 834, 851, 106 S.Ct. 2224, 2234, 90 L.Ed.2d 841 (1986); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 142, 92 S.Ct. 1456, 1466, 31 L.Ed.2d 741 (1972). Plaintiff invokes the jurisdiction of this Court and contends that the United States has waived sovereign immunity under a number of different stat-

utes, including 28 U.S.C. §§ 1331, 1346, 1361, 1362, 2201, and 5 U.S.C. § 702. This Court will consider each of these statutes in turn.[10]

■ Section 1331[11] sets forth the general federal question jurisdiction of federal district courts, but is not a general waiver of sovereign immunity allowing suits against the government. *See Doe v. Civiletti*, 635 F.2d 88, 94 (2d Cir.1980); *see also Devilbiss v. Small Business Administration*, 661 F.2d 716, 718 (8th Cir.1981). If another statute waives sovereign immunity, then § 1331 may provide a supplementary basis for federal jurisdiction.

■ Section 1361,[12] the mandamus provision, also does not waive the sovereign immunity of the United States. *See Murray v. United States*, 686 F.2d 1320, 1325 (8th Cir.1982), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983); *Watson's Estate v. Blumenthal*, 586 F.2d 925, 935 (2d Cir.1978); *Hill v. United States*, 571 F.2d 1098, 1101 n. 5 (9th Cir.1978); *McQueary v. Laird*, 449 F.2d 608, 611 (10th Cir.1971). If § 1361 were a waiver of sovereign immunity, a plaintiff could largely skirt the sovereign immunity doctrine altogether by invoking 28 U.S.C. § 1361. Section 1361 was not intended to be a sweeping waiver of sovereign immunity, but was designed to permit a form of relief against United States officials.

■ The Rosebud Sioux Tribe also contends that § 1362 provides a foundation for subject matter jurisdiction in this case. Section 1362 states:

The district court shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a govern-

---

**10.** The United States has previously filed a motion to dismiss for want of jurisdiction. In an order filed on November 12, 1987, this Court denied the motion to dismiss. This Court, nonetheless, must continue to scrutinize whether it has jurisdiction in this case. Indeed, the issue of subject matter jurisdiction can be raised sua sponte during the pendency of the case. *United States v. Hutchings*, 835 F.2d 185, 186 (8th Cir. 1987). In the briefing that led to the submission of this case, the United States again raised the issue of subject matter jurisdiction, and the Rosebud Sioux Tribe responded with further briefing on the question.

**11.** 28 U.S.C. § 1331 provides:

The district court shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States.

**12.** 28 U.S.C. § 1361 states:

The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

ing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

Congress passed § 1362 to permit Indian tribes to bring suits in federal court to protect their federally derived property rights when the United States has declined to act on the tribe's behalf. Section 1362 in effect eliminates the $10,000 jurisdictional requirement for Indian tribes and permits tribes to bring claims that the United States could have brought but chose not to. *See Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 472, 96 S.Ct. 1634, 1641, 48 L.Ed.2d 96 (1976); *Standing Rock Sioux Indian Tribe v. Dorgan*, 505 F.2d 1135, 1140 (8th Cir.1974). Section 1362, however, is not a waiver of sovereign immunity for money damages in a suit against the United States. *Scholder v. United States*, 428 F.2d 1123, 1125 (9th Cir.1970), *cert. denied*, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246; *Pueblo of Taos v. Andrus*, 475 F.Supp. 359, 364 (D.D.C. 1979); *Cape Fox Corp. v. United States*, 456 F.Supp. 784, 794 (D.Alaska 1978), *rev'd in part on other grounds*, 646 F.2d 399 (9th Cir.1981).

■ Plaintiff further asserts that this Court has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201.[13] By its express terms, § 2201 is a remedial statute applicable only to controversies already within this Court's jurisdiction. Section 2201 does not create an independent basis for jurisdiction, but merely grants this Court the power to issue declaratory judgments in cases where this Court otherwise has jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950); *First Federal Savings & Loan Ass'n v. Anderson*, 681 F.2d 528, 533 (8th Cir.1982); *Dubray v. Rosebud Housing Authority*, 565 F.Supp. 462, 468 (D.S.D.

1983). Consequently, the Declaratory Judgment Act does not provide an additional means of entry into the federal courts. *Lawrence County v. State of South Dakota*, 668 F.2d 27, 29 (8th Cir.1982); *Coomes v. Adkinson*, 414 F.Supp. 975, 984 (D.S.D. 1976).

B. *28 U.S.C. § 1346 as a Waiver of Sovereign Immunity.*

■ Section 1346 codifies both the Tucker Act and the Federal Tort Claims Act and constitutes an explicit but limited waiver of sovereign immunity for suits against the United States. Since the instant suit is a breach of trust claim and not a tort action, it comes within the scope of the Tucker Act, codified at 28 U.S.C. § 1346(a). The Tucker Act grants this Court limited jurisdiction to hear damage claims against the United States when there is an independent substantive right enforceable against the United States for money damages. *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). In relevant part, § 1346(a) states:

The district court shall have original jurisdiction, concurrent with the United States Claims Court, of:

(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution or any act of Congress, or any regulation of an executive department, or any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort,....

By its express terms, § 1346(a)(2) limits the jurisdiction of district courts to claims not exceeding $10,000 in amount. The Rosebud Sioux Tribe's initial complaint requested an award of $150,000, though subsequent papers filed with this Court indicate that the Tribe now requests $47,874.00.[14] Consequently, the breach of

---

**13.** Section 2201 in pertinent part provides:

In a case of actual controversy within its jurisdiction, ... any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal rela-

tions of any interested party seeking such declaration....

**14.** Plaintiffs originally requested $100,000 on the theory that if Greenwald were not involved in the tribal ranching business, the BIA would

trust claim requesting damages in excess of $10,000 is not within the Tucker Act jurisdiction of this Court.

■■■ The fact that the Rosebud Sioux Tribe requests equitable relief in addition to damages does not necessarily bring the case within the jurisdiction of this Court. A plaintiff cannot evade the $10,000 jurisdictional limit contained in § 1346(a)(2) by framing a complaint to seek injunctive or declaratory relief. *Alamo Navajo School Bd., Inc. v. Andrus*, 664 F.2d 229, 233 (10th Cir.1981); *Sherar v. Harless*, 561 F.2d 791, 793–94 (9th Cir.1977); *Hoopa Valley Tribe v. United States*, 219 Ct.Cl. 492, 596 F.2d 435, 436 (1979). Section 1346(a)(2), however, does not bar this Court from consideration of claims not seeking damages against the United States. Indeed, some courts have even stated that sovereign immunity in general does not bar suits for injunctive or declaratory relief. *See State Highway Comm'n of Missouri v. Volpe*, 479 F.2d 1099, 1123 (8th Cir.1973); *Rockbridge v. Lincoln*, 449 F.2d 567, 572–73 (9th Cir.1971); *Pueblo of Taos v. Andrus*, 475 F.Supp. 359, 364 (D.D.C.1979); *Coomes v. Adkinson*, 414 F.Supp. 975, 983 (D.S.D. 1976). Yet, neither does § 1346(a)(2) grant this Court jurisdiction to issue injunctive relief in this case.[15] *Lee v. Thorton*, 420 U.S. 139, 95 S.Ct. 853, 43 L.Ed.2d 85 (1975). Section 1346(a)(2), therefore, prevents this Court from considering the breach of trust claim for damages but leaves unresolved jurisdiction over the additional equitable claims.

## C. *5 U.S.C. § 702 and Sovereign Immunity.*

Section 702 is the part of the Administrative Procedure Act pertaining to judicial review of agency action. Section 702 in relevant part states:

> A person suffering legal wrong because of agency action is entitled to judicial review thereof. An action in a Court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.... Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

■■■ Section 702 is a somewhat quixotic statute. It does not provide an independent source of jurisdiction, does not grant this Court jurisdiction over money damage claims, and does not alter the analysis under § 1346(a)(2) concerning the instant claim for money damages. *See Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed. 2d 192 (1977); *Doe v. Civiletti*, 635 F.2d 88, 94 (2d Cir.1980). Yet, § 702 may be a waiver of sovereign immunity when there is general federal question jurisdiction and no limitation on judicial review besides the sovereign immunity question. *Sprecher v. Graber*, 716 F.2d 968, 973–74 (2d Cir.1983). In essence, § 702 acts as a general consent to suits requesting equitable relief from administrative action or inaction. *See United States v. Mitchell*, 463 U.S. 206, 227 n. 32, 103 S.Ct. 2961, 2973 n. 32, 77

---

have forgiven a $100,000 tribal indebtedness. The BIA apparently forgave the $100,000 debt anyway. The United States also mentions that it has forgiven in excess of $5 million of additional indebtedness of the Rosebud Sioux Tribe for loans incurred in financing the Rosebud ranch and farming enterprise and the tribal relending program. The United States suggests that any damage award should be offset by the amounts of the loan forgiveness. This Court need not reach the issue of the effect of the forgiveness of indebtedness on an ultimate damage award.

**15.** Indeed, a district court considering a claim under § 1346(a)(2) sits in essence as the claims court and therefore lacks equity authority. *Bakersfield City School Dist. of Kern County v. Boyer*, 610 F.2d 621, 628 (9th Cir.1979); *Werner v. U.S. Dept. of Interior, Fish & Wildlife Service*, 581 F.2d 168, 170–71 (8th Cir.1978).

L.Ed.2d 580 (1983); *Hoopa Valley Tribe v. United States*, 219 Ct.Cl. 492, 596 F.2d 435, 444 (1979); *Coomes v. Adkinson*, 414 F.Supp. 975, 984–85 (D.S.D.1976). Section 702, however, neither authorizes this Court to probe into discretionary functions of administrative officials nor provides a means to challenge the constitutionality of legislation, the legality of regulations, or the propriety of discretionary administrative acts. *Dalehite v. United States*, 346 U.S. 15, 27, 73 S.Ct. 956, 963, 97 L.Ed. 1427 (1953); *Miller v. United States*, 522 F.2d 386, 387 (6th Cir.1975).

■ The Rosebud Sioux Tribe requests two forms of equitable relief: a writ of mandamus and a declaratory judgment claim. These equitable claims set forth federal law questions concerning the actions or inactions of an administrative agency. The interplay of 5 U.S.C. § 702 and 28 U.S.C. §§ 1331, 1361 and 1362 provides a sufficient waiver of sovereign immunity and grant of jurisdiction for this Court to entertain these equitable claims. *Cf., Red Lake Band of Chippewa Indians v. Barlow*, 834 F.2d 1393, 1397 n. 5 (8th Cir.1987); *Massachusetts v. Departmental Grant Appeals Bd.*, 815 F.2d 778, 781 (1st Cir.1987); *Willis v. United States*, 787 F.2d 1089, 1092–93 (7th Cir.1986); *Coyote Valley Band of Pomo Indians v. United States*, 639 F.Supp. 165 (E.D.Cal.1986); *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F.Supp. 1238, 1242 (N.D.Cal.1973). With regard to the mandamus and declaratory relief claims, this Court must determine whether it is appro-priate to resolve the claim and what the proper disposition of the request is. Resolution of these issues involves matters of law which are ripe for decision at this time.

## III. THE EQUITABLE CLAIMS.

### A. *Mandamus Relief.*

This Court's conclusion that it has jurisdiction over the request for a writ of mandamus is bolstered by the fact that the Claims Court [16] does not have authority to issue such relief. Although Congress recently has expanded the jurisdiction of the Claims Court through amendment of 28 U.S.C. § 1491, the Claims Court continues to lack jurisdiction to grant equitable relief. *See United States v. King*, 395 U.S. 1, 3–5 (1969); *American Indians Residing on Maricopa–Ak Chin Reservation v. United States*, 667 F.2d 980, 983 (Ct.Cl.1981); *Menominee Tribe of Indians v. United States*, 221 Ct.Cl. 506, 607 F.2d 1335 (1979). Indeed, the oft-stated maxims of interpreting statutes to favor Indians militates for permitting access through district courts to equitable forms of relief such as mandamus in breach of trust cases. *See* R. Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians*, 27 Stanford L.Rev. 1213, 1235 (1975) (equitable relief in Indian breach of trust cases affords greater protection to Indians). Moreover, deciding whether a writ of mandamus is appropriate in this case does not undermine or preempt a decision in the Claims Court on the merits of the damages claim.[17]

---

**16.** The Claims Court is a non-Article III court established in 1982. Its predecessor was the Court of Claims. *See Coleman v. U.S. Bureau of Indian Affairs*, 715 F.2d 1156, 1162 n. 39 (7th Cir.1983). For a history of the Claims Court as it relates to Indian claims, see *United States v. Mitchell*, 463 U.S. 206, 214–216, 103 S.Ct. 2961, 2966–68, 77 L.Ed.2d 580 (1983); *see also* Comment, *Indian Breach of Trust Suits: Partial Justice in the Court of the Conqueror*, 33 Rutgers L.Rev. 502 (1981).

**17.** As mentioned previously, a plaintiff cannot evade the $10,000 jurisdictional limit on damages under 28 U.S.C. § 1346(a)(2) by framing the complaint to sound in equity when damages are requested. For example, in *Hoopa Valley Tribe v. United States*, 219 Ct.Cl. 492, 596 F.2d 435 (1979), the Court of Claims affirmed the ruling of a trial judge that a claim by an Indian tribe was essentially for damages even though the prayer was exclusively for equitable and declaratory relief. The tribe had sought both a declaratory judgment that the government had improperly deprived the tribe of revenues derived from timber from a portion of the Hoopa Valley Reservation and an equitable decree requiring the government to turn over those monies.

With regard to the mandamus request, the instant case is quite different. The Rosebud Sioux Tribe, in addition to requesting money damages, seeks to compel the promulgation of regulations to govern business development on reservations. This portion of the complaint is

Section 1361,[18] the mandamus section, permits this Court to compel an officer of the United States to perform an official duty. A writ of mandamus, however, is improper in this case for two reasons. First, § 1361 applies solely to federal officers, and the failure to name federal officers as defendants renders § 1361 inapplicable. *Murray v. United States*, 686 F.2d 1320, 1326 (8th Cir.1982), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983). The Mandamus Act simply does not apply to the United States itself. *Morpurgo v. Board of Higher Education*, 423 F.Supp. 704, 714 (S.D.N.Y.1976).

Second, the circumstances of this case do not justify issuance of a writ of mandamus. Mandamus is a drastic remedy that will not lie absent a showing that: (1) plaintiff has a clear right to the relief sought; (2) defendants have a plainly defined ministerial duty to perform the act in question; and (3) plaintiff has no adequate alternative remedy and will suffer irreparable harm absent judicial intervention. *United States ex rel. Girard Trust Co. v. Helvering*, 301 U.S. 540, 543, 57 S.Ct. 855, 857, 81 L.Ed. 1272 (1937); *Darr v. Carter*, 640 F.2d 163, 165 (8th Cir.1981). The first two requirements for a writ of mandamus are not satisfied under the circumstances of this case.

The Rosebud Sioux Tribe seeks a writ of mandamus to compel promulgation of regulations governing economic development on Indian reservations and governing non-Indian businessmen's dealings with tribes. The Tribe relies primarily on 25 U.S.C. §§ 261–62 and argues that these statutes require the promulgation of regulations.[19] Sections 261 and 262 state respectively:

§ 261.

The Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians.

§ 262.

Any person desiring to trade with the Indians on any Indian reservation shall, upon establishing the fact, to the satisfaction of the Commissioner of Indian Affairs, that he is a proper person to engage in such trade, be permitted to do so under such rules and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians.

In both these statutes, the crucial language pertaining to regulations is permissive; that is, the statutes refer to regulations that the Secretary "may" prescribe rather than explicitly requiring promulgation of regulations. Nevertheless, such permissive statutory language conceivably could impose a duty on the Secretary to issue regulations. *Rockbridge v. Lincoln*, 449 F.2d 567 (9th Cir.1981); *see also Scalise v. Meese*, 687 F.Supp. 1239 (N.D.Ill. 1988) (statute providing that Attorney General "is authorized ... to make regulations" mandates promulgation of regulations under the circumstances). Congress' intent in passing the legislation largely governs whether statutory language obliges an administrative agency to establish regulations and thus whether there is "a plainly defined ministerial duty." Similarly, the legislative history and intent governs whether the scope of §§ 261 and 262 would encompass Harvey Greenwald as a "trader" and thus whether the Tribe has "a clear right to relief sought" in this case.

Section 261 was passed in 1876 primarily to protect Indians from exploitation by non-Indian traders. 4 Cong.Rec. (44th Cong. June 20, 1876) pp. 3906–3926. Much of the legislative history concerning § 261 consists of recounts of instances where unreg-

not a thinly veiled attempt to claim damages from the United States, as was the prayer in *Hoopa Valley Tribe.* Rather, the Rosebud Sioux Tribe's request for a writ of mandamus sets forth a completely different claim, separate and divisible from the claim for money damages.

**18.** *See supra* footnote 12.

**19.** 25 U.S.C. § 81 is the statute governing federal approvals of contracts involving Indian tribes. Section 81 contains no reference to the issuance of regulations.

ulated trading posts on reservations flourished at the expense of Native Americans. Courts that have reviewed § 261 confirm that the thrust of the section is to protect Indians from unethical business practices. *Rockbridge v. Lincoln,* 449 F.2d 567, 570–71 (9th Cir.1971); *see also Ashcroft v. United States Dept. of Interior,* 679 F.2d 196, 198 (9th Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983); *Central Machinery Co. v. Arizona Tax Comm'n,* 448 U.S. 160, 165, 100 S.Ct. 2592, 2596, 65 L.Ed.2d 684 (1980). Section 262 was passed in 1903 to protect Indians from unscrupulous traders. Unfortunately, there is very little legislative history surrounding § 262. The legislative histories of both §§ 261 and 262 are devoid of a clear indication of whether the authorization of regulations was intended to create an obligation to regulate. And there is very little indication as to whether the word "trader" as contained in the statutes was intended to encompass all businessmen on the reservation or just those operating trading posts. Neither the parties nor this Court has found any cases clarifying the scope and applicability of §§ 261 and 262.

With regard to the duty to promulgate regulations under §§ 261 and 262, the most pertinent case is *Rockbridge v. Lincoln,* 449 F.2d 567 (9th Cir.1971). In *Rockbridge,* a group of Navajo Indians filed a class action complaint seeking to compel government officials to adopt regulations governing traders doing business on the Navajo Indian Reservation under §§ 261 and 262. *Id.* at 568. The district court dismissed the case for want of jurisdiction.

*Id.* at 569. On appeal, the United States Court of Appeals for the Ninth Circuit reversed and held that the district court had jurisdiction under 5 U.S.C. § 702. The court examined the history of §§ 261 and 262 and concluded:

> In sum, the legislative history does not support the contention that the regulations promised under §§ 261, 262 are wholly within the discretion of the Commissioner and thus immune from judicial review.

*Id.* at 572.[20] The court also determined that the doctrine of sovereign immunity did not provide an obstacle to jurisdiction in the case. The court then remanded the case to the district court for an adjudication of the merits. *Id.* at 573.

*Rockbridge* in essence determined that the discretionary function exception to 5 U.S.C. § 702 did not apply to the question of the duty to issue regulations under §§ 261 and 262. *Rockbridge,* however, did not take the additional step of deciding that §§ 261 and 262 indeed compelled the promulgation of regulations. Although *Rockbridge* suggests that the permissive language of §§ 261 and 262 may create some duty to issue regulations, a number of other courts have refused to read statutory language similar to §§ 261 and 262 as mandating regulations. *See, e.g., Fernandez v. Brock,* 840 F.2d 622, 632 (9th Cir.1988); *Burglin v. Morton,* 527 F.2d 486, 488 (9th Cir.1975), *cert. denied sub. nom, Burglin v. Kleppe,* 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976); *United States v. Bowden,* 182 F.2d 251, 252 (10th Cir.1950).[21]

**20.** With regard to § 261 alone the court stated: There can be no question but that when Congress enacted § 261 it intended that the Commissioner would "specify the kind and quantity of goods and the prices at which such goods shall be sold to the Indians". Congress delegated to the Commissioner the task of determining the specific content of these regulations. This does not mean that the Commissioner has unbridled discretion to refuse to regulate, but rather that he shall exercise discretion in deciding what regulations to promulgate and in determining specific quantities, prices and kinds.
*Rockbridge,* 449 F.2d at 571. Regulations under § 261 as to quantity and prices of goals on reservations would not encompass Greenwald's

economic development activities and therefore do not support a writ of mandamus in this case. This Court, however, expresses no opinion on whether the failure to promulgate regulations under § 261 and § 262 constitutes a breach of trust.

**21.** This court recognizes that standards of administrative law tend to be more strict when statutes benefitting Native Americans are involved. *Jicarilla Apache Tribe v. Supron Energy Corp.,* 728 F.2d 1555, 1567 (9th Cir.1984) (Seymour, J. concurring in part and dissenting in part, which opinion was adopted en banc at 782 F.2d 855 (9th Cir.1985)); *see Morton v. Ruiz,* 415 U.S. 199, 236, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *see also Antoine v. Washington,* 420 U.S.

In addition, courts should give deference to agency interpretations of statutes that the agency is charged to administer. *Environmental Protection Agency v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980). The Department of the Interior, the agency now charged with administration of §§ 261 and 262, quite apparently has interpreted §§ 261 and 262 as not mandating issuance of regulations governing trading with Indians; this Court has found no regulations, besides those governing attorneys retained by tribes, that appear to have been issued in pursuance of §§ 261 and 262.

All in all, it is quite unclear whether §§ 261 and 262 would apply to Greenwald and whether §§ 261 and 262 require promulgation of regulations. A writ of mandamus only lies when there is a "clear right to relief sought" and a "plainly defined ministerial duty to perform." *Darr v. Carter*, 640 F.2d 163, 165 (8th Cir.1981). Under the circumstances of this case, neither of these requirements are satisfied.

### B. *Declaratory Judgment Relief.*

 The Rosebud Sioux Tribe also requests a declaratory judgment that the United States is in breach of its trust obligation. Although this Court would have jurisdiction to enter a declaratory judgment in this case, the request for a declaratory judgment of liability for breach of trust invades the exclusive jurisdiction of the Claims Court to adjudicate liability and award damages in this suit. *Cf., Polos v. United States*, 556 F.2d 903, 905–06 n. 5 (8th Cir.1977); *Hoopa Valley Tribe v. United States*, 219 Ct.Cl. 492, 596 F.2d 435 (1979). This portion of the case is for the Claims Court to decide. Although the

Claims Court appears to lack authority to issue declaratory judgments, the Claims Court in evaluating the damages claim in this case must determine whether the United States is in breach of its trust responsibilities,[22] which is tantamount to issuing the requested declaratory judgment.

## IV. DISPOSITION OF THE CASE.

This Court dismisses the portion of the case requesting a writ of mandamus, but the rest of the case is for the Claims Court to adjudicate. When a case under the exclusive jurisdiction of the Claims Court is filed in a federal district court, the court generally should transfer the case rather than dismissing it altogether. *Polos v. United States*, 556 F.2d 903, 906 (8th Cir. 1977); *United States v. Welborn*, 495 F.Supp. 833, 837 (M.D.N.C.1980). Therefore, this Court transfers the remainder of the case to the Claims Court.

---

194, 199–200, 95 S.Ct. 944, 948, 43 L.Ed.2d 129 (1975) (courts are to resolve ambiguities in favor of Native Americans and to construe liberally statutes passed on behalf of Native Americans); *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973). However, there are limitations to the canon of constructions favoring Native Americans. *See, e.g., Rosebud Sioux Tribe v. South Dakota*, 709 F.Supp. 1502, 1511 n. 13 (1989).

**22.** The Claims Court has fairly broad authority to enter judgments in Indian law cases that are somewhat equitable in nature. *Duncan v. United States*, 229 Ct.Cl. 120, 667 F.2d 36, 40–41 (1981), *cert. denied*, 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983); *Hoopa Valley Tribe v. United States*, 219 Ct.Cl. 492, 596 F.2d 435, 437 n. 2 (1979); *Cheyenne–Arapaho Tribes of Oklahoma v. United States*, 206 Ct.Cl. 340, 512 F.2d 1390, 1392 (1975).